In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2477

THOMAS MURRAY,

*Plaintiff-Appellant*,

*v.*

NEW CINGULAR WIRELESS SERVICES, INC.,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 04 C 7666—**Ruben Castillo**, *Judge*.

———————

No. 06-4368

DARRELL BRUCE,

*Plaintiff-Appellant*,

*v.*

KEYBANK N.A.,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:05cv330—**Rudy Lozano**, *Judge*.

———————

No. 07-2370

ILENE L. PRICE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CAPITAL ONE BANK (USA), N.A.,

*Defendant-Appellee*.

————————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05-C-947—**C.N. Clevert**, *Judge*.

————————

ARGUED NOVEMBER 28, 2007—DECIDED APRIL 16, 2008

————————

Before EASTERBROOK, *Chief Judge*, and FLAUM and
WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. We have grouped for deci-
sion three appeals under the Fair Credit Reporting Act
presenting issues that have arisen in numerous suits
throughout the circuit. Each of the appeals presents at
least two issues, several of which recur in multiple appeals.
We therefore organize the opinion around these issues
rather than the facts of the cases, which we use to illus-
trate the problems.

1. *Must an offer of credit be valuable to all or most recipients*?
A company usually may access a consumer's credit
information only if the consumer initiates the transaction.
The statute makes an exception, however: Firms may
obtain lists of names and addresses that credit bureaus
generate from their databases according to the stated

criteria. For example, a bank might ask for a list of everyone in Illinois who purchased a home, with a mortgage loan, during the last three years and is current on payment. That list may be used to make an offer of refinancing, or of a loan against the equity in the residence. The statute allows this only if the person requesting the information uses it to make "a firm offer of credit or insurance". 15 U.S.C. §1681b(c)(1)(B)(i).

Suppose someone wants to use credit information to promote merchandise. One way to do this might be to make an offer of the product (say, a television set or a suite of furniture) together with a token line of credit (say, $100 toward $10,000 worth of furniture). We held in *Cole v. U.S. Capital, Inc.*, 389 F.3d 719 (7th Cir. 2004), that this gimmick does not work—that the offer must have value if viewed as one of credit alone. "A definition of 'firm offer of credit' that does not incorporate the concept of value to the consumer upsets the balance Congress carefully struck between a consumer's interest in privacy and the benefit of a firm offer of credit for all those chosen through the pre-screening process. From the consumer's perspective, an offer of credit without value is the equivalent of an advertisement or solicitation [for the product rather than the loan]*." Id*. at 726–27.

Ever since *Cole* plaintiffs have contended that this approach must be applied, not only to distinguish between offers of merchandise and offers of credit, but also to decide whether even a simple offer of credit is valuable enough to justify the use of consumers' credit files. Two of the cases before us present arguments of this kind. Darrell Bruce contends that KeyBank did not make a "firm offer of credit" because its offer of home-equity financing did not include all material terms, and without knowing

every term (such as whether interest was to be simple or compound) the consumer could not assess the offer's value. Ilene Price and other plaintiffs contend that Capital One Bank did not make a "firm offer of credit" because the flyer offering them Visa cards did not state the minimum line of credit each would receive, and without this knowledge the offer's worth was uncertain. Both Bruce and Price rely heavily on *Cole*.

As we have said, these are just the latest attempts to apply *Cole* to pure offers of credit. None has succeeded. See, e.g., *Forrest v. Universal Saving Bank, F.A.*, 507 F.3d 540 (7th Cir. 2007); *Perry v. First National Bank*, 459 F.3d 816 (7th Cir. 2006). Some of our decisions have analyzed the offer to see whether it would be attractive to a substantial fraction of recipients. But the principal reason why none of these claims has prevailed, and why none of them *can* prevail, is that §1681b(c)(1)(B)(i) calls for a firm offer of credit but not a *valuable* firm offer of credit. A firm offer of credit suffices. *Cole* did not doubt this. The problem in *Cole* was how to disentangle an offer *of merchandise* from an offer *of credit* when they are made jointly (in *Cole*, the merchant was selling cars and offered to extend credit for a small fraction of the price). We asked whether the offer of credit would be valuable standing alone in order to see whether the non-consensual check of a person's credit history had been used to make an offer of merchandise, something the statute does not allow.

*Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006), remarked that "*Cole*'s objective was to separate *bona fide* offers of credit from advertisements for products and services, determining from '*all* the material conditions that comprise the credit product in question . . . [whether it] was a guise for solicitation rather than a

legitimate credit product'." 434 F.3d at 955–56 (emphasis in *Cole*; internal citation omitted). What was an observation in *Murray* is now a holding. *Cole* is beside the point for pure offers of credit. When credit histories are used to offer credit (or insurance) and nothing but, the right question is whether the offer is "firm" rather than whether it is "valuable." That the interest rate is said to be "too high" or the line of credit "too low" or the rule for compounding interest unstated is not relevant to the question posed by §1681b(c)(1)(B)(i).

2. *Does a promise of "free" merchandise mean that an offer is not one "of credit"*? Thomas Murray contends that a telephone company violated FCRA by obtaining from a credit bureau a list of persons to receive a circular that touts a "free phone." This phone is available only to someone who signs up for a year or more of service, but as Murray sees things the lure of a phone makes it hard for the consumer to understand that the point of the offer is the service. True, phone service is neither "credit" nor "insurance," but the circular offers phone service *on* credit, because the service is provided before payment is due. Deferred payment is "credit" as the statute uses that word. 15 U.S.C. §1681a(r)(5), incorporating §1691a(d). A "free" phone is anything but free, as it can't be had apart from the service plan; payments for service include the cost of the phone, which is amortized over the length of the contract. So payment for the phone is deferred no less than payment for the phone service; the entire offer therefore is one of credit, whether or not a given consumer gets the point.

Now it is true that the credit can't be used to buy someone else's product. Verizon does not extend credit to users of AT&T's service, or the reverse. Nor will Ford lend

money to buy an Audi. This does not detract from the fact that an offer of a Ford with deferred payment is an offer of credit. The offer need not be fully portable to be "credit" within the statutory definition: "The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. §1691a(d).

3.   *Must the initial flyer contain all material terms*? KeyBank's offer of home-equity credit stated that the interest rate would be "based on" the prime rate according to the Wall Street Journal at the time the loan was made and could vary "by district, product and credit qualification." It did not mention terms such as the loan's duration and did not specify all fees. Capital One Bank's offer of a Visa card did not state the minimum amount of credit that each card would have. Plaintiffs say that these omissions negate the existence of a "firm offer of credit." To the extent this argument rests on *Cole* and the proposition that an offer with omitted terms lacks value, it is wrong for the reason given already. To the extent that these arguments reflect a belief that there can be no offer of any kind without all material items, it is wrong because "firm offer" is a defined phrase.

> The term "firm offer of credit or insurance" means any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer, except that the offer may be further conditioned on one or more of the following:

(1) The consumer being determined, based on information in the consumer's application for the credit or insurance, to meet specific criteria bearing on credit worthiness or insurability, as applicable, that are established—

> (A) before selection of the consumer for the offer; and

> (B) for the purpose of determining whether to extend credit or insurance pursuant to the offer.

(2) Verification—

> (A) that the consumer continues to meet the specific criteria used to select the consumer for the offer, by using information in a consumer report on the consumer, information in the consumer's application for the credit or insurance, or other information bearing on the credit worthiness or insurability of the consumer; or

> (B) of the information in the consumer's application for the credit or insurance, to determine that the consumer meets the specific criteria bearing on credit worthiness or insurability.

(3) The consumer furnishing any collateral that is a requirement for the extension of the credit or insurance that was—

> (A) established before selection of the consumer for the offer of credit or insurance; and

> (B) disclosed to the consumer in the offer of credit or insurance.

15 U.S.C. §1681a(*l*). The question posed by this definition is whether the offer will be *honored* (if the verification checks out), not whether all terms appear in an initial mailing. Anyone who has read a disclosure statement under the Real Estate Settlement Practices Act knows that the number of terms for a home-equity loan is formidable, and even the list under the Truth in Lending Act (which would apply to the credit card) is nothing to sneeze at. Neither §1681a(*l*) nor anything else in FCRA says that the initial communication to a consumer must contain all of the important terms that must be agreed on before credit is extended. Trying to disclose everything in the first contact would make the document turgid and, paradoxically, uninformative, because it would be harder to read and grasp. Consumers would lose some of the benefit of competition among lenders—which is facilitated by the sort of offers these plaintiffs received.

4. *Does a power to vary the deal's terms make the offer not "firm"?* KeyBank's letter informed readers that the rate of interest would vary by "product and credit qualification" and that closing costs could run between $1,000 and $2,000. Tiny type added: "Actual rates, fees and terms are based on those offered as of the date of application and are subject to change without notice." It is possible to read these caveats to make the offer illusory. Then there might be nothing on the table that a consumer could accept, and the statutory definition of a "firm offer" would not be satisfied.

We say that it is *possible* to read the caveats this way, but that reading is not inevitable. Caveats such as the one in this letter may reflect nothing more than the statutory privilege to verify a consumer's qualifications and raise the rate of interest (or required security) if it turns out

that the consumer is less credit-worthy than it appeared from the preliminary screening. Or perhaps the reference means that routine terms such as late fees (are they $25 or only $15?) may change between when a brochure is printed and the time any given consumer signs on the dotted line, and that the terms will be those generally applicable when the contract comes into force. That would not make an offer less than firm, as the statute defines that phrase.

So has KeyBank reserved a right to walk away by naming onerous terms any time it does not want to lend money to a particular customer, or has it just made clear the power to charge more if, after verification, the consumer is not as good a credit risk as things seemed initially? It would be possible to inquire, through discovery, how KeyBank has used the powers reserved in its letter. Bruce did not seek discovery on this issue, however. His position, in the district court and here, is that the letter's language is all that matters. Because the letter is ambiguous, that position is untenable. Plaintiff has the burden of persuasion, so his decision to forego discovery means that the language in KeyBank's letter cannot be used to defeat the existence of a "firm offer of credit".

Capital One Bank's letter does not contain as bald a reservation of a power to set terms later, but the omission of a minimum line of credit and maximum interest rate comes to the same thing. Here too the lender is doing no more than the statute permits. It isn't possible to give definitive credit limits and rates without knowing the consumer's full credit history and other particulars, such as income. Only very simple screening precedes these offers. Anyone who passes the screen is assured of credit, but people who on a follow-up check have higher-than-

minimum credit scores will get better rates and higher limits, while those who have (since the screening) fallen below the minimum will have to pay higher interest rates for less credit. Capital One Bank could not reveal all of the details in the space allowed by an initial offer—and the full algorithm that relates credit information to credit terms may be a trade secret. The statute does not require the revelation of these details as part of a "firm offer"; but unless the algorithm in all its complexity is to be laid out, any honest offer will leave some matters for future determination. Accord, *Sullivan v. Greenwood Credit Union*, 2008 U.S. App. LEXIS 5774 (1st Cir. Mar. 19, 2008).

5. *Is six-point type "conspicuous"?* Anyone who uses consumer credit information in a transaction that was not initiated by the consumer must "provide with each written solicitation made to the consumer" a statement that

> (A) information contained in the consumer's consumer report was used in connection with the transaction;

> (B) the consumer received the offer of credit or insurance because the consumer satisfied the criteria for credit worthiness or insurability under which the consumer was selected for the offer;

> (C) if applicable, the credit or insurance may not be extended if, after the consumer responds to the offer, the consumer does not meet the criteria used to select the consumer for the offer or any applicable criteria bearing on credit worthiness or insurability or does not furnish any required collateral;

> (D) the consumer has a right to prohibit information contained in the consumer's file with any consumer reporting agency from being used in

connection with any credit or insurance transaction that is not initiated by the consumer; and

(E) the consumer may exercise the right referred to in subparagraph (D) by notifying a notification system established under section 1681b(e) of this title.

15 U.S.C. §1681m(d). This statement must be "clear and conspicuous". The word "clear" presumably means "in easy to understand language." But what is "conspicuous"? The statute does not offer a definition—which means, alas, that the demand for "conspicuous" notice is not "clear."

The Federal Trade Commission issued in 2005 a regulation defining "conspicuous" to mean at least 8-point type for the full notice, plus a short notice in 12-point type on the brochure's first page. 16 C.F.R. §642.3. The Commission can't adopt substantive rules for private litigation; this regulation concerns only its enforcement activities. See 15 U.S.C. §1681s(a)(1), (e). Still, it offers a useful guidepost that was unavailable to Cingular, which sent its offer to Murray. (We call the defendant "Cingular" even though it now operates under the name AT&T. Counsel assured us that the entity "New Cingular Wireless Services, Inc." still exists.) Cingular used 6-point type. The first word is all capitals. But 6-point type is tiny. A printer's point is 0.01384 of an inch, so 6-point type is about $^1/_{12}$ inch tall, and a glyph in 6-point type has ¼ the area of the same glyph in 12-point type. This is what Cingular's disclosure, at the bottom of a page dominated by a color picture of a Nokia cell phone and large-type (14 to 24 point) promotional language, looked like:

DISCLOSURE: We'd like you to know about the terms of this pre-approved offer. You were selected to receive this special offer because you satisfied certain criteria for creditworthiness, which we have previously established. We used information obtained from a consumer-reporting agency. We may choose to withdraw this offer if we determine you do not meet the criteria used to select you for the

offer or any other applicable criteria bearing on creditworthiness. You have the right to prohibit information contained in your credit files with this or any consumer-reporting agency from being used with any credit transaction that is not initiated by you by notifying Equifax, Inc., c/o Equifax Options, P.O. Box 740123, Atlanta, GA 30374-0123, or by calling 1 (888) 567-8688.

Cingular concedes that this disclosure flunks not only the FTC's approach but also the standard we devised in *Cole*, which held that a statement much smaller than the principal type on the page cannot be "conspicuous." 389 F.3d at 731. But the brochure was mailed before *Cole* issued, and Cingular did not have its benefit.

Six-point type in black ink is not "conspicuous" when the bulk of the page contains much larger type. Whether 6-point type in color might suffice is a question we need not address, since Cingular used color only for the picture and its promotional text.

6. *Is the use of 6-point type a "willful" violation of FCRA*? Cingular's violation of the statute entitles Murray to actual damages, but he has not tried to prove any. Instead he seeks statutory damages, which may range from $100 to $1,000 per violation whether or not the consumer was injured. 15 U.S.C. §1681n(a). But statutory damages are available only for willful violations of the Act, and the Supreme Court held in *Safeco Insurance Co. v. Burr*, 127 S. Ct. 2201 (2007), that this means recklessness—something more than negligence but less than knowledge of the law's requirements.

"Recklessness" is a protean term, one that might flunk the statutory requirement of clarity if included in a disclosure statement. But it is the Supreme Court's understanding of the statute. The Court did not stop with the word "reckless." It added that

> a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the stat-

ute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

127 S. Ct. at 2215. This standard, the Court stated, is objective.

Cingular's reading of the Act was mistaken, but if the error was careless it did not create a risk substantially above the risk usually associated with careless readings. Because the statute does not define "conspicuous", and the FTC had not issued its guidance, where was a company to turn? Appellate decisions are a logical place, but they did not help much. When Cingular mailed its brochure, two courts of appeals had interpreted that term. *Stevenson v. TRW Inc.*, 987 F.2d 288 (5th Cir. 1993), read it the way we later did in *Cole*. But *Guimond v. Credit Bureau Inc.*, 1992 U.S. App. LEXIS 2640 (4th Cir. Feb. 25, 1992), concluded that a disclosure in "small but clear and readable type" is "conspicuous" as far as FCRA is concerned. Although *Guimond* is non-precedential, the fourth circuit (like other federal appellate courts) uses that designation only for decisions that follow well-understood rules that need no elaboration. That *Guimond* thought obvious in 1992 a position that *Stevenson* held obviously wrong in 1993 shows something of the problem facing Cingular.

If federal appellate decisions under FCRA don't solve this problem (at least had not solved it before Cingular acted), the most natural alternative is state law. And the logical place to turn is the Uniform Commercial Code, which uses the phrase "clear and conspicuous" in several sections. It is hard to avoid thinking that whoever drafted §1681m(d) must have assumed that "clear and conspicuous" is a term of art in commercial law and

therefore needs no federal definition. Unfortunately, that assumption is wrong, because, although the UCC supplies a definition, it is internally contradictory.

> "Conspicuous", with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
>
>> (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>>
>> (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

UCC §1-201(b)(10) (2001 revised ed.). Every state has a statute modeled on this language. Cingular found §1–201(b)(10)(A) and concluded that capitalizing the word "DISCLOSURE" brought the paragraph within the definition, because the immediately preceding paragraph also was in 6-point type. But the main part of §1–201(b)(10), which defines "conspicuous" as something that the person affected "ought to have noticed", implies that some type can be so small that a capitalized heading "equal to or greater in size than the surrounding text" will not be enough. It is of course possible to read (A) and (B) as safe harbors, working even if the affected person assuredly would not have noticed the statement; then 1-point type

in light grey would do, even though it would be invisible to normal readers, provided only that it followed a throw-away paragraph in 1-point light-grey type. That would be an implausible reading of §1–201(b)(10).

We do not think it reckless, however, for Cingular to have read §1–201(b)(10)(A) as authorizing its approach, when the actual paragraph was in 6-point type that is readable despite its small size. The problem is not that people can't read black sans-serif type at that size, but that the eye is not drawn to it. Even if it was careless to conclude from §1–201(b)(10)(A) that capitalizing the first word was enough, Cingular did not take a risk "substantially greater" than is associated with ordinary careless-ness. It would be reckless *today* to use the same notice, given *Cole* and such assistance as 16 C.F.R. §642.3 pro-vides, but it was not reckless to act as Cingular did in 2003.

To sum up:

In *Murray*, the offer of a free phone in connection with a service plan is an offer of credit. Although the disclosure required by 15 U.S.C. §1681m(d) was not conspicuous, Cingular did not wilfully violate FCRA because it was not reckless. The district court did not anticipate *Safeco*'s adoption of a recklessness standard but came to the same ultimate conclusion on each issue, 432 F. Supp. 2d 788 (N.D. Ill. 2006), and its judgment is affirmed.

In *Bruce*, the circular made a "firm offer of credit" despite the omission of some material terms and the reservation of a power to change terms. The district court errone-ously held otherwise, see 2006 U.S. Dist. LEXIS 91371 (N.D. Ind. Dec. 15, 2006), but went on to conclude that the violation was not willful because KeyBank did not know that it was violating the Act. That approach, too,

is erroneous in light of *Safeco* (which was released after the district court's opinion). Neither of the district court's missteps calls for a remand. Because we hold that there was no violation, the judgment is affirmed.

In *Price*, the district court held that the omission of a minimum line of credit is compatible with a "firm offer of credit" and entered judgment for Capital One Bank. 2007 U.S. Dist. Lexis 37796 (E.D. Wis. May 22, 2007). We agree with this conclusion and affirm.