In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-1037

BROOKE PERSINGER,

*Plaintiff-Appellant,*

*v.*

SOUTHWEST CREDIT SYSTEMS, L.P.,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 19-cv-00853 — **Richard L. Young**, *Judge.*

———————————

ARGUED OCTOBER 27, 2021 — DECIDED DECEMBER 22, 2021

———————————

Before MANION, WOOD, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* In 2017, a bankruptcy court discharged Brooke Persinger's debts. A few months later, Southwest Credit Systems began collection efforts on a pre-petition debt of Persinger's, including by acquiring a type of credit information called her "propensity-to-pay score." Alleging that this information had been secured without a permissible purpose, Persinger sued Southwest under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*. The district court

granted summary judgment to Southwest, holding that Southwest's compliance procedures were reasonable and thus met the FCRA's requirements. For the reasons that follow, we affirm.

**I**

Persinger and her husband jointly filed for bankruptcy in 2017. Their bankruptcy petition listed each creditor to which they individually, or jointly, owed a debt. One such creditor was Southwest, who was servicing an AT&T debt incurred by Persinger's husband in 2014. This was the only debt for which Southwest was listed as a creditor.

The bankruptcy court ordered a discharge of the Persingers' debts under 11 U.S.C. § 727. The discharge order listed Brooke Persinger's four former names, including, as relevant here, Brooke Casey. Following the discharge order, the bankruptcy court notified all known creditors, including Southwest, of its ruling.

When Southwest received this notice, it scanned its system for affected accounts. Per company policy, Southwest closes accounts subject to bankruptcy. But by the time Southwest received notice of the Persingers' 2017 bankruptcy, it had already closed the AT&T account.

Bankruptcy notices are not the only way Southwest learns about discharged debts. Upon receiving a new account, Southwest orders a "bankruptcy scrub" from LexisNexis—a process by which LexisNexis searches for bankruptcy information connected to that account. If matching bankruptcy data is discovered, it is immediately returned to Southwest. If no immediate match is discovered, LexisNexis stores the account information, continuously searches for matches, and

forwards any bankruptcy data it later finds. As with bankruptcy notices, if a bankruptcy scrub reveals that an account is subject to bankruptcy, Southwest closes the account.

In January 2018, Southwest received a delinquent account in Brooke Persinger's former name, Brooke Casey, for a debt owed to Viasat Residential. This debt, though delinquent since 2014, was not listed on Persinger's 2017 bankruptcy petition. Southwest, as a matter of course, ordered a bankruptcy scrub. Because LexisNexis did not immediately return any bankruptcy results, Southwest proceeded in its collection efforts.

To form a collection strategy, Southwest orders a "propensity-to-pay score" from a consumer credit reporting agency. This is not a full credit report but rather a form of "soft pull" indicating the likelihood of repayment on a scale of 400 to 800. Unlike a "hard pull," a soft pull is not visible to third parties and does not affect one's credit score. Because the bankruptcy scrub did not return any bankruptcy data, Southwest ordered Persinger's propensity-to-pay score. Several months later, though, LexisNexis updated Persinger's account with information about her 2017 bankruptcy. Upon receiving this update, Southwest closed the account.

After learning that Southwest accessed her credit information, Persinger filed a class-action complaint against Southwest, alleging violations of the FCRA. Following discovery, the parties filed cross-motions for summary judgment; the district court granted Southwest's motion and denied Persinger's motion. On appeal, Persinger challenges the grant of summary judgment to Southwest.

## II

Before proceeding to the merits, we must answer the jurisdictional question of whether Persinger has standing to sue. Although the district court did not address Southwest's argument that Persinger lacked standing, we have an "independent obligation" to inspect, and remain within, jurisdictional boundaries. *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 281 (7th Cir. 2020) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)). "The Article III standing inquiry remains open to review at all stages of the litigation." *Pennell v. Glob. Tr. Mgmt., LLC*, 990 F.3d 1041, 1044 (7th Cir. 2021) (internal quotation marks omitted). But the plaintiff's "burden to demonstrate standing changes as the procedural posture of the litigation changes." *Gracia v. SigmaTron Int'l, Inc.*, 986 F.3d 1058, 1063 (7th Cir. 2021). Where, as here, the procedural posture is summary judgment, the plaintiff must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks omitted).

Federal jurisdiction "extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting U.S. CONST. art. III, § 2). Standing doctrine enforces this limitation by ensuring that courts only adjudicate disputes in which the plaintiff has a "personal stake." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Standing consists of three elements: injury in fact, causation, and redressability. *Lujan*, 504 U.S. at 560–61. This case concerns the first element—injury in fact—which means the injury must be both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks omitted).

For an injury to be concrete, it must be "real, and not abstract." *Spokeo*, 578 U.S. at 340 (internal quotation marks omitted). Tangible harms, like physical or monetary harms, "readily qualify as concrete injuries." *Ramirez*, 141 S. Ct. at 2204. Intangible harms may also be concrete, for example, "reputational harms, disclosure of private information … intrusion upon seclusion[,] … [a]nd those traditional harms … specified by the Constitution itself." *Id.* In determining whether a harm is concrete, "history and tradition offer a meaningful guide." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008). "[C]ourts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Ramirez*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341).

When it comes to identifying concrete harms, Congress's judgment is important. But even if Congress imposes a "statutory prohibition or obligation and a cause of action," courts must still "independently decide whether a plaintiff has suffered a concrete harm under Article III." *Id.* at 2205. "[U]nder Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.*

The FCRA imposes statutory prohibitions and obligations, including that a person shall not use or obtain a consumer report without a permissible purpose. 15 U.S.C. § 1681b(f). The Act also provides a cause of action for negligent and willful violations. 15 U.S.C. §§ 1681n–o. Persinger asserts that Southwest violated § 1681b(f), causing her harm. This is not enough

on its own to confer standing. We must decide whether this harm qualifies as a concrete injury.

When reviewing potential injuries for standing purposes, we are constrained by the operative complaint. *Pennell*, 990 F.3d at 1045. Persinger's complaint alleged "financial and dignitary harm … and an injury to her credit rating and reputation."

Persinger's deposition testimony illuminated these allegations. Southwest's counsel asked Persinger how she was harmed by Southwest's inquiry into her propensity-to-pay score. She responded, "Harmed? I mean, there's stress on it, yes." Probing for more, counsel asked her if she had been harmed in any other way. She added, "My personal privacy." To confirm, counsel asked if any she had experienced any harm besides "personal privacy and stress."  Persinger answered, "No, sir."

Prompted by Southwest's counsel, Persinger clarified what she meant by harm to her "personal privacy," explaining: "My consumer report is for me and for the people that I allow to look things up in, not for people that I didn't sign off for, didn't give them permission to do." When asked if Southwest's access angered her, Persinger responded "yes."[1]

Next, Southwest's counsel questioned Persinger about any harms she may have suffered, making certain that Persinger experienced only "stress" and an infringement of personal privacy, congruent with her earlier answer. He asked her if Southwest's inquiry affected her ability to get a job; she confirmed it did not. She gave the same response regarding

---

[1] *See* R. 101-1 at 58:14–59:20.

her ability to obtain loans or credit cards—Persinger stated it was not affected. Counsel continued: "You haven't lost any money because of Southwest Credit's inquiry on your credit report, have you?" Persinger replied, "Not to my acknowl-edgement." Pressing on, counsel then asked Persinger whether she had been denied housing, credit, employment, or insurance. Persinger answered in the negative to each. In summary, Southwest's counsel asked: "So really the only way Southwest Credit report's inquiry has affected you that you know of is it was essentially an invasion of your privacy; is that correct? Persinger answered, "Yes."[2]

Persinger's deposition testimony undercuts her allega-tions of financial, credit, and reputational injuries. To begin, she affirmatively represented that the only injury she suffered was an invasion of privacy—though she initially named stress too. Beyond this, she explicitly disclaimed loss of money, housing, employment, or insurance (financial harms) and loss of credit (credit harm). Persinger's deposition provided no in-formation supporting the existence of reputational harm, and she does not point us to anything else in the record support-ing this claim. So, that leaves us with dignitary harm as the only allegation in Persinger's complaint that might qualify as a concrete injury.

But what did Persinger mean by dignitary harm? Her deposition testimony and interrogatory responses supply two options: stress and privacy harm. Even if stress can be fairly labeled a dignitary harm, it is not a concrete injury. *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668–69 (7th Cir. 2021). A privacy harm, on the other hand, might be concrete,

---

[2] *See* R. 101-1 at 60:25–61:2; 66:10–68:1.

and it is a form of dignitary harm. *See Dignitary*, BLACK'S LAW DICTIONARY (11th ed. 2019). Importantly, it is the only eligible harm for standing purposes—one that is both grounded in the complaint and uncontradicted by the record. Closer examination is necessary to determine whether this privacy harm is a concrete injury under Article III.

Under *Spokeo, Inc. v. Robins* and *TransUnion LLC v. Ramirez*, to determine whether a harm is concrete, we look to both history and Congress's judgment. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2552 (2021).

Starting with history, courts look for a common law analog to determine whether an alleged injury has "a close relationship to a harm traditionally recognized as providing a basis for lawsuits in American courts." *Ramirez*, 141 S. Ct. at 2204. Persinger used the phrase "invasion of privacy," but we must look behind this allegation to determine whether the challenged conduct bears a "close relationship" to the tort. According to Persinger, Southwest violated the FCRA by obtaining her credit information without a permissible purpose. The next step is to pair this alleged violation—and the alleged harm—to a common law analog, assessing whether a close relationship exists.

Traditionally, the tort of invasion of privacy encompassed four theories of wrongdoing: intrusion upon seclusion, appropriation of a person's name or likeness, publicity given to private life, and publicity placing a person in a false light. *See* RESTATEMENT (SECOND) OF TORTS §§ 652A–652E (AM. L. INST. 1977). For this case, intrusion upon seclusion is the best comparator, which occurs when a person "intrudes … upon the solitude or seclusion of another or his private affairs or

concerns" and this "intrusion would be highly offensive to a reasonable person." *Id.* § 652B. For example, an intrusion upon seclusion may be committed "by opening [a person's] private and personal mail, searching his safe or his wallet, [or] examining his private bank account." *Id.* § 652B cmt. b.

An unauthorized inquiry into a consumer's propensity-to-pay score is analogous to the unlawful inspection of one's mail, wallet, or bank account. To be sure, a propensity-to-pay score is a number—distilled from a consumer's financial history—indicating likelihood of repayment. In that sense, it provides less information to a debt collection agency than a full credit report would provide. Nevertheless, *Spokeo* and *Ramirez* make clear our responsibility to look for a close relationship "in kind, not degree." *See Gadelhak*, 950 F.3d at 462. Whether Persinger would prevail in a lawsuit for common law invasion of privacy is irrelevant.[3] It is enough to say that the harm alleged in her complaint resembles the harm associated with intrusion upon seclusion. *See id.* at 462–63. Thus, it

---

[3] At oral argument, Southwest's counsel urged us to apply the elements of intrusion upon seclusion, arguing that Persinger's injury falls short of being highly offensive to a reasonable person—one of the tort's elements. Oral Argument at 11:30–12:43. Counsel was correct about intrusion upon seclusion's elements, *see* RESTATEMENT (SECOND) OF TORTS § 652B, but under *Ramirez*, we do not look for an "exact duplicate," we look for a "close relationship." *Ramirez*, 141 S. Ct. at 2209. In *Ramirez*, the Supreme Court referenced defamation's "essential" element of publication not to apply, in full, the elements of defamation, but to explain why defamation failed as an analogy for those plaintiffs whose inaccurate information had not been shared. *See id.* at 2209–10. In sum, once we identify a tort analog, our role ends. And here, the tort analog is intrusion upon seclusion. Whether unauthorized procurement of a propensity-to-pay score is "highly offensive," moderately offensive, or slightly offensive is not before us.

is a concrete injury. *Cf. Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1155–56 (7th Cir. 2020) (holding that an alleged violation of Illinois's Biometric Information Privacy Act constituted a concrete injury because the unauthorized collection of biometric data was analogous to an invasion of privacy); *Gadelhak*, 950 F.3d at 462–63 (analogizing to intrusion upon seclusion and ruling that receiving "unwanted text messages can constitute a concrete injury-in-fact").

Congress's judgment supports our view. Although "Congress cannot transform a non-injury into an injury on its say-so," *Gadelhak*, 950 F.3d at 462, the FCRA's protection of consumer credit information is akin to the common law's protection of private information through the tort of invasion of privacy. To safeguard consumer credit information, Congress drafted § 1681b, which makes it unlawful to furnish, obtain, or use a consumer's credit information without a permissible purpose. In doing so, Congress created a federal cause of action for a common-law-like harm; it did not attempt to "enact an injury into existence." *Ramirez*, 141 S. Ct. at 2205 (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).

This conclusion fits well with our recent decision in *Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872 (7th Cir. 2020). In *Crabtree*, as here, the plaintiff alleged a § 1681b violation. *See id.* at 875. The defendant claimed, as its permissible purpose for disclosing the plaintiff's credit information, the provision of the FCRA allowing a consumer reporting agency to disclose credit information without consumer initiation if the disclosure results in a "firm offer of credit or insurance." *Id.* at 875; 15 U.S.C. § 1681b(c)(1)(B)(i). Because the plaintiff conceded he likely received a firm offer of credit, he failed to articulate a concrete harm. *Crabtree*, 948 F.3d at 879.

Even though *Crabtree* held that the plaintiff lacked standing, it made clear that some FCRA violations may qualify as concrete harms. *Id.* at 879–80. This observation followed from the Supreme Court's recognition of a "right to privacy that 'encompass[es] the individual's control of information concerning his or her person,'" *id.* (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989)), and Congress's decision to protect this right in the FCRA. *Id.* Additionally, *Crabtree* noted our previous recognition of a consumer's right to privacy in credit information. *See Cole v. U.S. Capital, Inc.*, 389 F.3d 719 (7th Cir. 2004) (holding that a plaintiff stated a claim under § 1681b when her credit information was shared but no firm offer of credit was extended). Under these principles, *Crabtree* correctly observed that a § 1681b violation may qualify as a concrete harm. This is such a case.

Looking to other federal courts of appeals, our reasoning comports with that of the Ninth Circuit, which recently held that a § 1681b(f) violation was a concrete injury. In *Nayab v. Capital One Bank*, 942 F.3d 480 (9th Cir. 2019), that court relied on circuit precedent, the common law analog of intrusion upon seclusion, and Congress's judgment to decide that the plaintiff's allegations of a § 1681b(f) violation supported standing. *Id.* at 489–93. We agree with its assessment of history and Congress's judgment. Particularly, the court concluded, as we do, that "[t]he harm attending a violation of § 1681b(f)(1) of the FCRA is closely related to—if not the same as—a harm that has traditionally been regarded as providing a basis for a lawsuit: intrusion upon seclusion (one form of the tort of invasion of privacy)." *Id.* at 491. And it noted that the FCRA's declared purpose of "insur[ing] that consumer reporting agencies exercise their grave responsibilities with

fairness, impartiality, and a respect for the consumer's right to privacy" evidenced Congress's judgment. *Id.* at 492

To sum up, history and precedent compel a simple result: Persinger has standing to sue. She testified that Southwest invaded her privacy when it reviewed her credit information. Under *Spokeo* and *Ramirez*, this is a concrete injury because it is analogous to the common law tort of intrusion upon seclusion. Thus, Persinger has standing to seek damages under 15 U.S.C. §§ 1681n–o.

**III**

Now we turn to the merits. We review the district court's summary-judgment order de novo and construe the record in the light most favorable to Persinger—the nonmoving party. *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020).

In 1970, the FCRA became law "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). Sharing credit information, "though often necessary in the modern economy, can result in a significant invasion of privacy and can jeopardize a consumer's personal, reputational, and financial well-being." *Rodriguez v. Sprint/United Mgmt. Co.*, 163 F. Supp. 3d 529, 533 (N.D. Ill. 2016).

To safeguard these interests, the FCRA provides a private right of action for injured consumers. *Safeco*, 551 U.S. at 53; *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001). A negligent violation entitles a consumer to actual damages. 15 U.S.C. § 1681o(a). A willful violation entitles a consumer to actual damages or statutory damages, with punitive damages left to

the court's discretion. 15 U.S.C. § 1681n(a). Persinger advances both a negligence theory and a willfulness theory.

**A**

To prove a negligent violation of the FCRA, a plaintiff must establish "actual damages." 15 U.S.C. § 1681o(a)(1); *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 607–08 (7th Cir. 2005). Actual damages require a "causal relation" between the statutory violation and the harm suffered by the plaintiff. *Aldaco v. RentGrow, Inc.*, 921 F.3d 685, 689 (7th Cir. 2019) (quoting *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001)).

An FCRA violation may inflict pecuniary harm, like lost income or out-of-pocket expenses caused by denials of credit, housing, or insurance. *Id*. at 689–90 (recognizing the possibility that an FCRA violation may cause denial of housing but holding that the plaintiff failed to establish causation); *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 241 n.2 (4th Cir. 2009) (identifying loss of income as a cognizable form of actual damages); *Crabill*, 259 F.3d at 664 (noting that "loss of credit" may support actual damages); *Millstone v. O'Hanlon Reps., Inc.*, 528 F.2d 829, 831 (8th Cir. 1976) (affirming award of actual damages after an inaccurate report caused temporary denial of insurance).

Nonpecuniary harms, including reputational damage and emotional distress, may also follow an FCRA violation, though these harms must be described in "reasonable detail"—conclusory statements are insufficient. *See Ruffin-Thompkins*, 422 F.3d at 610; *see also Robinson*, 560 F.3d at 241 (holding that plaintiff provided sufficient proof of emotional distress caused by FCRA violation); *Konter v. CSC Credit Servs., Inc.*, 606 F. Supp. 2d 960, 969 (W.D. Wis. 2009)

(concluding that plaintiff failed to establish a causal link between FCRA violation and emotional distress). However the plaintiff frames her case, she bears the burden to prove actual damages, whether pecuniary or nonpecuniary. *Ruffin-Thompkins*, 422 F.3d at 610.

For Persinger to survive Southwest's motion for summary judgment on her negligence theory, she was required to proffer evidence showing Southwest impermissibly accessed her propensity-to-pay score causing her pecuniary or nonpecuniary harm. She failed to do so. As to pecuniary harm, she disavowed any loss of credit, housing, employment, money, or insurance. When asked if invasion of privacy was the only harm caused by Southwest's actions, she answered, "Yes." According to Persinger, this invasion of privacy caused her "stress" and "anger." But damages for emotional distress must be proved with more than conclusory statements. *Ruffin-Thompkins*, 422 F.3d at 610. In short, Persinger's testimony not only failed to support her claim for actual damages but also disproved it. With respect to negligence, then, summary judgment for Southwest was appropriate because no reasonable juror could conclude that the inquiry into Persinger's propensity-to-pay score resulted in actual damages.

**B**

Even if a plaintiff cannot prove actual damages, she may still recover statutory or punitive damages by proving that the defendant willfully violated the FCRA. 15 U.S.C. § 1681n(a); *Redman v. RadioShack Corp.*, 768 F.3d 622, 627 (7th Cir. 2014).

A willful violation is one committed with actual knowledge or reckless disregard for the FCRA's requirements. *Safeco*, 551 U.S. at 57. A company recklessly violates

the FCRA when it commits "a violation under a reasonable reading of the statute's terms," and its erroneous reading "[runs] a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69; *see also Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 726 (7th Cir. 2008) (discussing and applying *Safeco*).

The *Safeco* standard raises a sequencing issue. Courts may pass over the antecedent question of whether a violation occurred, moving directly to whether the defendant negligently or willfully violated the statute. *See Marino v. Ocwen Loan Servicing LLC*, 978 F.3d 669, 674 (9th Cir. 2020) (discussing sequencing in FCRA cases). This is akin to the sequencing dilemma courts face in qualified immunity cases. *Safeco*, 551 U.S. at 70 (citing, as analogous, *Saucier v. Katz*, 533 U.S. 194 (2001)); *Marino*, 978 F.3d at 674. In *Safeco*, the Supreme Court first decided whether a violation occurred, then it turned to the analysis of mental state. *See Safeco*, 551 U.S. at 60–70. We do the same here, as we have in the past. *See, e.g., Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794, 798–804 (7th Cir. 2010) (deciding whether a violation occurred before assessing mental state).

**1**

The FCRA prohibits consumer credit reporting agencies from furnishing a "consumer report,"[4] except in enumerated

---

[4] Southwest does not dispute that a propensity-to-pay score is a "consumer report." By statute, a "consumer report" includes "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness." 15 U.S.C. § 1681a(d)(1). A propensity-to-pay score fits this description.

circumstances—in other words, when there is a permissible purpose. 15 U.S.C. § 1681b(a). Relatedly, a person shall not "use or obtain a consumer report" unless it is obtained for a permissible purpose. *Id.* § 1681b(f).

Persinger claims that Southwest violated § 1681b(f) when it obtained her propensity-to-pay score. As a permissible purpose, Southwest points to § 1681b(a)(3)(A), which allows a person to obtain a consumer report if he (1) "intends to use the information," (2) "in connection with a credit transaction," (3) "involving the consumer on whom the information is to be furnished," and (4) "involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

A premise to Persinger's argument is that § 1681b(a)(3)(A) does not apply when a consumer's debts have been discharged in bankruptcy. Such an understanding would be too broad, but this nuance seems to have eluded the parties, as neither of them discussed the statutory language in their briefs.[5]

---

[5] We take this moment to address one other textual matter. For § 1681b(a)(3)(A) to qualify as a permissible purpose, there must be a "credit transaction involving the consumer." 15 U.S.C. § 1681b(a)(3)(A). The FCRA defines "credit" to mean "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." *Id.* §§ 1681a(r)(5), 1691a(d). In our view, the plain meaning of "credit transaction" contemplates an agreement by which the right of deferred payment is promised in exchange for some form of consideration.

In this case, the account for which Southwest requested credit information is a debt owed to Viasat Residential. Whether this transaction between Persinger and Viasat Residential is a "credit transaction" is unclear from the record. To the extent this affects Southwest's ability to claim

The plain meaning of § 1681b(a)(3)(A) does not unambiguously forbid access to credit information relating to an account subject to bankruptcy. When a debt-collection agency "intends to use" a consumer report "in connection with a credit transaction involving the consumer on whom the information is to be furnished," the agency may obtain and use that report if it also "intends to use" the consumer report to (1) extend credit to the consumer, (2) review her account, or (3) collect on her account. *See* 15 U.S.C. § 1681b(a)(3)(A).

Persinger focuses on the third option, "collection of an account." *Id.* § 1681b(a)(3)(A). To the extent Southwest intended to use Persinger's credit information to collect on the Viasat debt, Persinger is right: Southwest would be unable to claim § 1681b(a)(3)(A) as a permissible purpose. After all, Southwest is a debt-collection agency, and it uses consumer credit information to form a collection strategy. Because Southwest does not suggest it had a reason for procuring Persinger's propensity-to-pay score other than for collection, § 1681b(a)(3)(A) provides no justification. To answer the antecedent question, then, obtaining a propensity-to-pay score for the purpose of collecting on a discharged debt violates the FCRA, absent another permissible purpose.

But a bankruptcy's effect on § 1681b(a)(3)(A) should not be read too broadly. Indeed, Southwest never concedes that it *always* lacks a permissible purpose when a bankruptcy impacts one of its accounts. In deposition testimony, Southwest's officers admitted to having a policy against proceeding

---

§ 1681b(a)(3)(A) as a permissible purpose, Persinger forfeited her opportunity to raise the issue. *United States v. Sheth*, 924 F.3d 425, 435 (7th Cir. 2019) ("A party forfeits an argument by failing to raise it below, or by raising it in a perfunctory or general manner.").

with collection efforts after it learns that a debt is discharged. This policy is grounded in practical and legal realities—a discharged debt cannot be collected (indeed, it is unlawful to try).[6] But Southwest's Chief Compliance Officer rejected the idea that bankruptcy made it illegal for Southwest to obtain a propensity-to-pay score altogether, leaving open the possibility that, in some instances, the FCRA would still permit Southwest to procure a consumer report notwithstanding an underlying bankruptcy.

We think this interpretation is correct, as do other courts, which have recognized that § 1681b(a)(3)(A) is not categorically inapplicable where the underlying debt is discharged or the underlying account is closed. *See Marino*, 978 F.3d at 672; *Levine v. World Fin. Network Nat. Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009); *Banga v. First USA, NA*, 29 F. Supp. 3d 1270, 1278 (N.D. Cal. 2014).

To recap, a firm violates the FCRA when it obtains a consumer report without a permissible purpose. 15 U.S.C. § 1681b(f). One permissible purpose is intending to use credit information to collect on an account. *See id.* § 1681b(a)(3)(A). But this permissible purpose is unavailable when the underlying debt is discharged. Thus, a debt-collection agency cannot claim § 1681b(a)(3)(A) as a permissible purpose if its sole purpose for accessing a consumer report is collection. Other reasons, even under § 1681b(a)(3)(A), may still justify obtaining a consumer report. Here, the record shows that Southwest intended to collect on the Viasat account, which was subject to bankruptcy. Accordingly, Southwest's credit inquiry fell outside the parameters of § 1681b(a)(3)(A).

---

[6] *See* 11 U.S.C. § 524(a); *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1800 (2019).

**2**

To prevail under § 1681n, Persinger must show that Southwest not only violated the FCRA but did so willfully. She points to two predicate actions: Southwest's handling of the 2017 bankruptcy notice and Southwest's bankruptcy scrub procedure. Viewed as a whole, Southwest's procedures—whether for handling bankruptcy notifications or ordering bankruptcy scrubs—were reasonable compliance efforts, not willful violations of the FCRA.

A willful violation is one committed with actual knowledge or recklessness. *Safeco*, 551 U.S. at 56–57; *Murray*, 523 F.3d at 726. Recall that Southwest passively receives notifications from bankruptcy courts and actively searches for bankruptcies affecting its open accounts. Persinger argues these procedures are flawed (to a willfully unlawful extent) because they failed to reveal her 2017 bankruptcy. It is true that Persinger's bankruptcy predated the Viasat debt's placement with Southwest. But we must determine whether Southwest's failure to reveal her bankruptcy occurred with actual knowledge or recklessness.

Starting with the bankruptcy notice, one critical problem with Persinger's argument is that she omitted the Viasat debt from her bankruptcy petition, so the bankruptcy court did not send a notice to any creditor for that debt. Thus, any lapse in notification was attributable to Persinger, not Southwest. Despite this, Persinger argues Southwest should have implemented a procedure for annotating its computer system with bankruptcy information for application to future accounts. This theory would require Southwest to retain bankruptcy information for consumers that may never have an account placed with Southwest—more specifically, the debtors listed

on the discharge order other than the debtor for which the notification was sent.

Persinger apparently expected Southwest not only to look for the debt listed on the bankruptcy notice—here, Persinger's husband's debt—but also document *her* name, and all her former names, just in case she ever had an account placed with Southwest. We agree with the district court that this prophylactic measure is not "reasonable." In addition to the practical peculiarities of Persinger's expectations, Southwest already implemented a procedure for uncovering bankruptcy data for future accounts—bankruptcy scrubs. Retaining every bankruptcy notice would be both inefficient and duplicative of this bankruptcy scrub process.

Persinger also attacks the adequacy of Southwest's bankruptcy-scrub procedure. First, Persinger suggests Southwest receives and logs an explicit "no" answer if LexisNexis does not find bankruptcy results. Second, she contends Southwest received a response from LexisNexis before May 22, 2018—when her account notes reflect a response. These propositions taken together support Persinger's theory: If the first is true, then the second does not matter because either (a) Southwest received a positive result from LexisNexis on January 4, 2018—reflecting Persinger's 2017 bankruptcy—and, with actual knowledge, accessed her credit information, or (b) Southwest recklessly accessed Persinger's credit information because it did not wait for a negative result from LexisNexis to be posted on the account notes. If the first proposition is false, then, to demonstrate that Southwest willfully violated the FCRA, Persinger must show that Southwest received a notice from LexisNexis of Persinger's bankruptcy on January 4, 2018, before it procured her credit information.

Persinger's assertion that Southwest logs a negative result fails to account for the testimony of Jeff Hazzard, a Southwest officer, who explained that LexisNexis only returns bankruptcy information when it receives a "hit." Southwest's Chief Compliance Officer, Katie Zugsay, testified congruently. In her deposition, she described the bankruptcy scrub procedure, and its production of a binary (yes or no) but she never explicitly, or implicitly, testified that LexisNexis generates a "no" that gets logged on the consumer's account. The record shows, without dispute, that only positive bankruptcy scrub results are returned.

As to timing, Persinger contends that Southwest received notice of her bankruptcy on January 4, 2018—before Southwest obtained her propensity-to-pay score—not May 22, 2018, the date Persinger's account notes reflect receipt. If true, this would demonstrate actual knowledge, and by extension, willfulness. To support her argument, Persinger turns to Zugsay's deposition testimony. But this testimony does not assist Persinger. In qualified language—riddled with phrases like "I believe" and "[i]t is my understanding"—Zugsay described her understanding that Southwest received results before the date reflected on the account notes. Rather than demonstrating that Southwest must have received notice of Persinger's bankruptcy before it procured her propensity-to-pay score, this testimony merely reinforces Hazzard's testimony that only positive bankruptcy-scrub results are logged, not negative results. Hazzard's testimony explained that a functional "no" from LexisNexis (not receiving a bankruptcy report) greenlights collection efforts but this "no" does not appear on account notes. This is what happened here. Southwest ordered a bankruptcy scrub, received no results, and continued to collect on the debt. Months later, it received additional

information from LexisNexis relating to Persinger's bankruptcy and shut down the account.

In sum, there is no genuine dispute that Southwest first learned of Persinger's 2017 bankruptcy on May 22, 2018, when LexisNexis returned bankruptcy information. At this point, Southwest promptly closed the account. The record demonstrates, without any genuine dispute, that Southwest had a procedure by which it submitted a consumer's information to LexisNexis, and if LexisNexis did not return bankruptcy information, it continued its collection activities. Southwest also processed incoming bankruptcy notices and closed affected accounts. To be sure, Persinger's debt was discharged[7] by the time Southwest obtained her propensity-to-pay score—for this, there was no permissible purpose under the FCRA. But Southwest lacked actual knowledge of the bankruptcy, and it did not recklessly disregard the possibility that debt had been discharged. The evidence shows that it had a reasonable basis for relying on its procedures.[8]

---

[7] Generally, a debt not listed by the petitioner on the bankruptcy schedule is not discharged. 11 U.S.C. § 523(a)(3). But in a "no-asset bankruptcy," there is an equitable rule in this circuit permitting a petitioner to amend its schedules post-discharge to include omitted debts. *In re Jakubiak*, 591 B.R. 364, 387–93 (Bankr. E.D. Wis. 2018) (discussing Seventh Circuit precedent). The parties agree the Persingers' bankruptcy resulted in a "no-asset discharge." So, even though the bankruptcy schedule omitted the Viasat debt, it could likely be added to the bankruptcy schedule and be considered discharged. *See Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 968 (7th Cir. 1996). Functionally, then, the Viasat debt was discharged.

[8] Southwest's compliance efforts appear successful. The putative class contains 996 members. Southwest maintains accounts for about 1.8 to 1.9 million consumers. Accepting Persinger's allegations as true, Southwest achieved a 99.9% compliance rate during the relevant two-year period.

**IV**

For these reasons, we AFFIRM the district court's grant of summary judgment to Southwest.

---

One could see a lower rate of compliance had Southwest knowingly violated the law or recklessly disregarded statutory requirements.