In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21‐3131
KENNETH CODY PUCILLO, formerly known as
KENNETH CODY LOCK, II,
 Plaintiff‐Appellant,

 v.

NATIONAL CREDIT SYSTEMS, INC.,
 Defendant‐Appellee.
 ____________________

 Appeal from the United States District Court for the
 Southern District of Indiana, Indianapolis Division.
 No. 1:19‐cv‐00285‐TWP‐DML — Tanya Walton Pratt, Chief Judge.
 ____________________

 ARGUED NOVEMBER 18, 2022 — DECIDED APRIL 26, 2023
 ____________________

 Before BRENNAN, KIRSCH, and LEE, Circuit Judges.
 BRENNAN, Circuit Judge. Kenneth Pucillo sued National
Credit Systems, Inc., alleging that the company violated the
Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692
et seq., when it sent him two collection letters about a debt dis‐
charged in bankruptcy. The district court dismissed the com‐
plaint, ruling that Pucillo lacked Article III standing. Because
2 No. 21‐3131

National Credit’s communications did not cause Pucillo any
concrete injury, we affirm.
 I.
 We evaluate de novo a dismissal for lack of Article III
standing. Nowlin v. Pritzker, 34 F.4th 629, 632 (7th Cir. 2022).
We take the facts from the evidentiary record the parties de‐
veloped in the district court when they cross‐moved for sum‐
mary judgment.
 Pucillo, an Indiana resident who formerly used the last
name Lock, had previously leased an apartment with Main
Street Renewal LLC (Main Street). He filed for Chapter 7
bankruptcy on May 30, 2017, and listed as a debt past‐due rent
he allegedly owed Main Street. The bankruptcy court granted
him a discharge on September 19, 2017, including of any debt
to Main Street. That bankruptcy discharge is a public record
and listed on Pucillo’s credit reports.
 But Main Street was not notified of Pucillo’s bankruptcy
case. And ten weeks before the discharge, on July 5, 2017,
Main Street had placed Pucillo’s account with National Credit
for collection. Over the next eighteen months, National Credit
sent Pucillo two collection letters, dated February 1, 2018, and
February 1, 2019. The body of each letter was identical, was
comprised of seven sentences, and described settlement op‐
tions. The letters also stated that if payment was made, Na‐
tional Credit “will update credit data it may have previously
submitted regarding this debt.”
 The week before Pucillo received the second letter, on Jan‐
uary 25, 2019, he filed this suit. He claimed that National
Credit violated 15 U.S.C. § 1692e (demanding payment of a
debt not owed) and 15 U.S.C. § 1692c(c) (failure to cease
No. 21‐3131 3

communications and cease collections) of the FDCPA. Pucillo
alleged in his complaint that National Credit’s “continued
collection communications after he had filed for bankruptcy
made [him] believe that his exercise of his rights through fil‐
ing bankruptcy may have been futile and that he did not have
the right to a fresh start that Congress had granted him under
the Bankruptcy Code … .” Six months later, Pucillo amended
his complaint, adding the second letter to his claims and al‐
leging that National Credit’s continued communications
“confused and alarmed” him.
 National Credit denied violating the FDCPA and said a
bona fide error had prevented proper processing and notice
of Pucillo’s bankruptcy filing. See 15 U.S.C. § 1692k(c). Na‐
tional Credit did not “furnish” on Pucillo’s account—that is,
give information about a consumer, including credit history,
to a credit reporting agency—before or after his bankruptcy
discharge.
 After discovery and an unsuccessful settlement confer‐
ence, both parties moved for summary judgment. In support
of his motion, Pucillo included his declaration that the collec‐
tion letters resulted in him being “confused and concerned as
to whether [his] debt to Main Street had been discharged” in
bankruptcy, and if it had not, he “feared” that “the non‐pay‐
ment of the debt would impact [his] credit.” Pucillo also said
that receiving the letters “scared” him because he “thought
that it would take even longer to improve [his] credit score
and reputation,” and that they “alarmed and upset” him and
“destroyed the ‘fresh start’” he had sought in his bankruptcy
filing.
 In March 2021, the district court denied both parties’
summary judgment motions as moot and dismissed the case,
4 No. 21‐3131

concluding that Pucillo lacked Article III standing to sue. The
district court relied on various recent decisions from our court
and held that the allegations in Pucillo’s pleadings—ʺconfu‐
sion,” “stress,” “concern,” and “fear”—are not sufficiently
concrete to result in an injury in fact that would give him
standing to sue. The court also noted that Pucillo’s amended
complaint did not claim that National Credit had reported the
alleged Main Street debt to credit reporting agencies, so he
could not argue that his credit was somehow affected, “giving
him some concrete, particularized harm.”
 Pucillo then moved under Federal Rules of Civil Proce‐
dure 59 and 60 to amend or alter the judgment.1 He argued
that his complaints alleged privacy violations, distinguisha‐
ble from the cases involving bare procedural violations on
which the district court relied. Pucillo believed his claims
were therefore sufficient to constitute an injury in fact and re‐
sult in Article III standing. The district court denied the mo‐
tion, concluding that his arguments were untimely or had al‐
ready been addressed in its earlier decision.2
 II.
 This case presents the question whether Pucillo has Article
III standing to sue, and in particular whether he has suffered
a concrete injury in fact.

 1 Pucillo also moved to supplement the record with the Supreme

Court’s decision in TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2200 (2021),
which the district court granted.
 2 Pucillo disputed the district court’s standing decision in his motion

to amend or alter the judgment, so he did not waive this argument on ap‐
peal.
No. 21‐3131 5

 A. Applicable Law
 Article III of the U.S. Constitution limits the jurisdiction of
federal courts to cases and controversies. U.S. CONST. art. III,
§ 2. A plaintiff must establish standing to sue as part of the
case‐or‐controversy limitation. Pierre v. Midland Credit Mgmt.,
Inc., 29 F.4th 934, 937 (7th Cir. 2022), cert. denied, 143 S. Ct. 775
(2023). To establish standing, “[a] plaintiff must have (1) a
concrete and particularized injury in fact (2) that is traceable
to the defendant’s conduct and (3) that can be redressed by
judicial relief.” Id. (citing Lujan v. Defs. of Wildlife, 504 U.S. 555,
560–61 (1992)). In federal court a plaintiff must have standing
to pursue the case presented in the complaint. See Pennell v.
Glob. Tr. Mgmt., 990 F.3d 1041, 1045 (7th Cir. 2021).
 On the first element, a concrete injury is “‘real,’ and not
‘abstract.’” Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016) (quot‐
ing the definition of Concrete, WEBSTER’S THIRD NEW
INTERNATIONAL DICTIONARY 472 (1971)). “Qualifying injuries
are those with a close relationship to a harm traditionally rec‐
ognized as providing a basis for a lawsuit in American
courts.” Pierre, 29 F.4th at 938 (cleaned up). This includes
“‘traditional tangible harms, such as physical harms and
monetary harms,’ as well as ‘[v]arious intangible harms,’ such
as ‘reputational harms, disclosure of private information, and
intrusion upon seclusion.’” Id. (quoting TransUnion, 141 S. Ct.
at 2204). The Supreme Court recently clarified that the “risk
of real harm,” Spokeo, 578 U.S. at 341, qualifies as a concrete
injury only for claims for “forward‐looking, injunctive relief
to prevent the harm from occurring.” TransUnion, 141 S. Ct. at
2210.
6 No. 21‐3131

 B. Analysis
 With this legal framework, we turn to Pucillo’s case.
 1. No concrete injuries
 A series of “our recent decisions mark the line between
FDCPA violations inflicting concrete injuries and those caus‐
ing no real harm.” Pierre, 29 F.4th at 938. The intangible harms
alleged in Pucillo’s pleadings and summary judgment decla‐
ration are insufficiently concrete under the applicable caselaw
to satisfy the first element of standing.
 The Supreme Court’s decision in TransUnion limits the in‐
tangible harms that can be considered concrete. We begin
with the mere risk of harm. In Pierre, we noted that “in
TransUnion, a risk of harm qualifies as a concrete injury only
for claims for ‘forward‐looking, injunctive relief to prevent
the harm from occurring.’” Id. (quoting TransUnion, 141 S. Ct.
at 2210). This weakens Pucillo’s standing argument, and he
admits that the mere risk of harm is not enough for a plaintiff
seeking monetary damages.
 Pucillo’s claim that he believed his bankruptcy filing “may
have been futile and that he did not have the right to a fresh
start” alleges only a risk of harm. The same is true for Pucillo’s
“fear that … the non‐payment of the debt would impact” his
credit, or that he is “scared” because he “thought it would
take even longer to improve [his] credit.” Each of these claims
reflect concerns over harms that might occur, not those that
have occurred. And a risk of real harm is not enough to estab‐
lish standing after TransUnion. 141 S. Ct. at 2210; Pierre, 29
F.4th at 939. As in Pierre, Pucillo did not “other‐wise act to
[his] detriment in response to anything,” 29 F.4th at 939, so
the risk he pleads of possible futility to his bankruptcy or
No. 21‐3131 7

potential harm to his credit does not satisfy the standing re‐
quirement of a concrete and particularized injury in fact.
 In other decisions this court has concluded that injuries
like those Pucillo alleges are insufficiently concrete. His com‐
plaints about being “concerned” and “upset” (Declaration ¶¶
7 & 8) are highly similar to being “worried” or “stressed,”
which we have ruled is not a concrete injury. Wadsworth v.
Kross, Lieberman, & Stone, Inc., 12 F. 4th 665, 668 (7th Cir. 2021);
Pennell, 990 F.3d at 1045.
 Pucillo also contends that the collection letters “confused”
and “alarmed” him. Indeed, Pucillo’s allegations that his
bankruptcy discharge might have been futile and that he did
not receive a fresh start could also be read as claiming confu‐
sion. But confusion is not enough after Pennell, 990 F.3d at
1045. See also Brunett v. Convergent Outsourcing, Inc., 982 F.3d
1067, 1068 (7th Cir. 2020) (holding that confusion alone is not
a concrete injury). And Pucillo’s argument resembles reason‐
ing that this court rejected in Markakos v. Medicredit, Inc., 997
F.3d 778, 780 (7th Cir. 2021) (collecting cases). There, the plain‐
tiff sued a collection agency under the FDCPA because the
agency’s collection letters contained inconsistent and incor‐
rect information, confusing and aggravating the plaintiff. Id.
at 780–81. We ruled that confusion was not enough to create
an injury in fact. Id. Rather, the plaintiff must show a harm
beyond emotional response, such as an adverse credit rating
or detrimental action that the plaintiff took in reliance on the
letters. Id. at 780 (citing Larkin v. Fin. Sys. of Green Bay, Inc., 982
F.3d 1060, 1066 (7th Cir. 2020)).
 Pucillo has not alleged any such harm. He does not, for
example, assert that he paid extra money to the debt collector
or the original creditor, forewent paying another debt, or
8 No. 21‐3131

abstained from some purchase because of the letters. See id. If
we were to recognize standing based solely on confusion or
alarm, unmoored from concrete harm, there would be no lim‐
iting principle. See Brunett, 982 F.3d at 1068 (explaining if “the
state of confusion” were an actionable injury, “then everyone
would have standing to litigate about everything”). Moreo‐
ver, the topic about which Pucillo was “confused” and
“alarmed”—whether the alleged debt to Main Street was still
owed and the bankruptcy discharge had given him a “fresh
start”—is a complaint about the risk of harm, not actual harm.
 We recognize that communications under the FDCPA are
interpreted under the “unsophisticated debtor” standard.
Veach v. Sheeks, 316 F.3d 690, 693 (7th Cir. 2003). When trying
to understand National Credit’s letters, Pucillo claims he be‐
came “confused,” “scared,” and “alarmed” about the status
of his bankruptcy discharge. But he provides no facts show‐
ing that his emotional response led to actionable injury.
 2. Tort law parallels
 Resisting this conclusion, Pucillo argues that his present
injuries are of the same kind held actionable under common
law invasion of privacy tort theories. An intangible harm can
qualify as a concrete injury in fact, but only when the harm
bears a “close relationship” to a traditional harm given re‐
dress in courts at common law. Spokeo, 578 U.S. at 340–341. In
deciding whether a harm is concrete, we are to look to both
history and Congress’s judgment. See Pierre, 29 F.4th at 938;
Persinger v. Sw. Credit Sys., L.P., 20 F.4th 1184, 1191 (7th Cir.
2021) (citing Gadelhak v. AT&T Servs., Inc., 950 F.3d 458, 462
(7th Cir. 2020)). That examination here persuades us that the
district court properly dismissed this case.
No. 21‐3131 9

 Pucillo argues that his standing allegations for intangible
damages correlate to two common law torts—invasion of pri‐
vacy and intrusion upon seclusion—and thus are sufficiently
concrete injuries for standing to sue. He analyzes the two torts
together, and points to his complaints and declaration as
pleading how his privacy was invaded and his seclusion in‐
truded upon. The district court overlooked these historical
parallels, Pucillo contends. But his attempt to fit his allega‐
tions within these torts falls short.
 An observation before proceeding: Pucillo refers to ʺinva‐
sion of privacy” and “intrusion upon seclusion” as distinct
torts, but they are usually framed somewhat differently than
that. As explained in Persinger, “the tort of invasion of privacy
encompassed four theories of wrongdoing: intrusion upon se‐
clusion, appropriation of a person’s name or likeness, public‐
ity given to private life, and publicity placing a person in a
false light.” 20 F.4th at 1192 (emphasis added). See also
RESTATEMENT (SECOND) OF TORTS § 652A (AM. LAW INST. 1977)
(identifying the “four forms of invasion of the right to pri‐
vacy”). Because the most apt of the invasion of privacy “the‐
ories” is intrusion upon seclusion, and Pucillo references it,
we focus our analysis there.
 Intrusion upon seclusion “occurs when a person ‘in‐
trudes … upon the solitude or seclusion of another or his pri‐
vate affairs or concerns’ and this ‘intrusion would be highly
offensive to a reasonable person.’” Persinger, 20 F.4th at 1192
(quoting RESTATEMENT (SECOND) OF TORTS § 652B). The phrase
“intrusion upon seclusion” does not appear in Pucillo’s com‐
plaints or his declaration. Though Pucillo did not need to in‐
clude this precise phrase in his pleadings, none of his allega‐
tions speak to such a theory of injury. Instead, his appellate
10 No. 21‐3131

briefing tries to shoehorn his allegations within that tort the‐
ory. Each time Pucillo invokes intrusion upon seclusion, he
claims the letters undermined his belief that his bankruptcy
discharge created a “fresh start.” But that alleged injury is not
actionable under intrusion upon seclusion, as the potential for
Pucillo’s bankruptcy case to be undone presents only a risk of
harm.
 Pucillo also alleges he experienced confusion and fear
upon receipt of the letters, but that alone gets him no closer to
a historical invasion of privacy. Intrusion upon seclusion re‐
quires more than just an emotional response—it requires a
particular kind of offensive intrusion. See Gadelhak, 950 F.3d at
462–63 (explaining that the proper focus is on whether an al‐
leged injury is of the same kind that common law courts rec‐
ognize). On that score, Pucillo points to only the letters. And
while courts have allowed intrusion upon seclusion liability
for “irritating intrusions,” there is nothing inherently bother‐
some, intrusive, or invasive about a collection letter delivered
via U.S. Mail. See id. at 462. Indeed, a letter is the means of
contact in many if not most of our FDCPA cases. See, e.g.,
Casillas v. Madison Ave. Assocs., Inc., 926 F.3d 329, 332 (7th Cir.
2019); Larkin, 982 F.3d at 1062; Gunn v. Thrasher, Buschmann &
Voelkel, P.C., 982 F.3d 1069, 1070 (7th Cir. 2020); Nettles v. Mid‐
land Funding LLC, 983 F.3d 896, 898 (7th Cir. 2020); Pennell, 990
F.3d at 1043; Markakos, 997 F.3d at 779; and Pierre, 29 F.4th at
936. Just so, this opinion should not be overread as encom‐
passing intrusive uses of either the mail or other kinds of con‐
tact not now before us.3

 3 Though we offer no opinion on facts not before us, other kinds of

mailings could impact seclusion more significantly. For example,
No. 21‐3131 11

 So the method of contact National Credit employed, with‐
out more, does not resemble the injury associated with intru‐
sion upon seclusion. This is true even if Pucillo emotionally
reacted to a non‐qualifying intrusion. Recall as well that Na‐
tional Credit did not furnish on Pucillo’s account, so there was
no invasion of his private information.
 Pucillo cites two decisions in support of his position on
standing, but both are distinguishable.
 In Persinger, a collection agency seeking to collect on a dis‐
charged debt asked a credit reporting agency for an aspect of
a consumer’s credit history without her permission. 20 F.4th
at 1188. The consumer sued under the Fair Credit Reporting
Act, 15 U.S.C. § 1681 et seq. This court ruled that such an un‐
authorized inquiry was sufficiently close to the common‐law
tort of intrusion upon seclusion to confer standing. Id. at 1193.
 Pucillo likens National Credit’s promise in its letters to
“update” its “previously submitted” credit “data” as a threat
to his credit reputation and thus a similar intrusion. But un‐
like the collection agency in Persinger, id. at 1189, Pucillo has
not alleged that National Credit ever reported to, solicited
from, or otherwise contacted any credit bureaus or other third
parties about information concerning him, let alone without
his authorization. In fact, it is undisputed that National Credit
did not furnish on Pucillo’s account. Thus, Persinger featured
an actionable intrusion—a “soft” credit pull—while Pucillo
alleges nothing like that. Id.

documents can be shipped with a signature requirement, compelling the
delivery person to ring the recipient’s doorbell or knock. We reserve rul‐
ing on those situations if and when they arise. We neither state nor imply
that standing turns merely on the number of letters an individual receives.
12 No. 21‐3131

 Pucillo also points to Gadelhak, 950 F.3d 458. There, this
court ruled that a plaintiff, who sued under the Telephone
Consumer Protection Act, 47 U.S.C. § 227, which bars certain
automated phone messages, was injured based on five
unwanted, automated text messages. Id. at 463. Automated
messages repeatedly sent to a personal phone, this court de‐
termined, resembled “irritating intrusions” barred at com‐
mon law. Id. at 462. To Pucillo, the two unwanted letters he
received, like the text messages in Gadelhak, intruded upon his
seclusion, and Congress intended for bankruptcy filings to
bar such letters.
 In Gadelhak, this court looked to the kind (rather than the
degree) of harm that the common law recognized to deter‐
mine if any intrusion was a concrete harm that Congress has
chosen to make legally cognizable. Id. at 462–63. The text mes‐
sages in Gadelhak differ in kind from the letters here. Text mes‐
sages may create an injury because they can disrupt a person
anytime, anywhere, thereby invading ʺprivate solitude.” Id. at
462. Indeed, as we explain in Gadelhak, “The undesired buzz‐
ing of a cell phone from a text message, like the unwanted
ringing of a phone from a call, is an intrusion into peace and
quiet in a realm that is private and personal.” Id. at 462 n.1. In
contrast, postal mail is delivered to a mailbox without inter‐
rupting the recipient’s seclusion. Mail can be picked up when,
if, and how often the recipient chooses, unlike a phone which
is usually on one’s person or close by throughout the day.
While receiving a letter can be an irritation, we do not see an
actionable analogy between a letter delivered to a mailbox
and automated text messages delivered to one’s cell phone.
As our dissenting colleague points out, a plaintiff searching
for a “common‐law analogue for their asserted injury” need
not identify “an exact duplicate.” TransUnion, 141 S. Ct. at
No. 21‐3131 13

2204. But the plaintiff’s alleged injury must still have a “close
relationship” to a traditionally recognized harm. Id. (quoting
Spokeo, 578 U.S. at 341). The delivery of two letters to Pucillo’s
mailbox, one year apart, one before suit was filed, is too far
afield from the traditional tort of intrusion upon seclusion to
allege an actionable claim.
 “[B]ecause Congress is well positioned to identify intangi‐
ble harms that meet minimum Article III requirements, its
judgment is also instructive and important” for determining
whether an intangible harm constitutes injury in fact. Spokeo,
578 U.S. at 341; see also Persinger, 20 F.4th at 1191; Gadelhak, 950
F.3d at 462. Thus, we must consider the Congressional judg‐
ment in the FDCPA. Relevant here, Congress legislated the
FDCPA to “eliminate abusive debt collection practices by debt
collectors.” 15 U.S.C. § 1692(e) (explaining purposes of the
FDCPA) (emphasis added). That Congressional judgment
supports a lack of Article III standing, because sending two
letters, one year apart and without any tangible consequences
for the recipient, is not the kind of abusive practice Congress
sought to prevent. Our conclusion thus accords with Con‐
gress’s judgment as well. Spokeo, 578 U.S. at 340.
 Given how this case unfolded, we can see why Pucillo
would want to invoke these tort theories from our recent
FDCPA standing decisions. He originally sued National
Credit in January 2019, and he amended his complaint in July
2019. Gadelhak was decided in February 2020. Pucillo moved
to alter or amend his judgment to include his standing argu‐
ments in April 2021, and Persinger was decided in December
2021. As this case has progressed, Pucillo’s arguments have
14 No. 21‐3131

morphed to include the labels of harms which this court has
recognized as conferring standing.4
 Pucillo’s problem, though, is that neither version of his
complaint contains the allegations recognized in other deci‐
sions as conferring standing. He argues he suffered several
potential harms, and he invokes different decisions of our
court in which standing has been found based on those
harms. But those two decisions are distinguishable, and there
is a gap between Pucillo’s pleadings in the district court and
the arguments he makes on appeal.5
 3. Motion to amend or alter judgment
 Pucillo asks us to reverse the decisions of the district court,
which include that courtʹs denial of his motion to amend or
alter judgment under Federal Rules of Civil Procedure 59 and
60. In that motion, Pucillo argued that the district court incor‐
rectly applied its precedent on what constitutes concrete in‐
jury for purposes of standing. The court disagreed, conclud‐
ing that Pucillo did not meaningfully distinguish many of the
cases discussed above, that his submissions lacked claims for

 4 A claim under the FDCPA is not Pucillo’s only avenue for relief. A

bankruptcy discharge enjoins any efforts to collect on discharged debts.
11 U.S.C. § 524(a)(2). A debtor who believes that a collection agency has
willfully violated the court’s injunction may seek recourse for contempt in
the bankruptcy court. See In re Sterling, 933 F.3d 828, 832 (7th Cir. 2019).
The record does not show that Pucillo brought such a contempt action;
instead, he chose to sue under the FDCPA. He is therefore subject to that
Act’s standing principles.
 5 Pucillo’s second claim, an alleged violation of 15 U.S.C. § 1692c(c) of

the FDCPA, also fails. There is no dispute that neither Pucillo or anyone
on his behalf notified National Credit of Pucillo’s bankruptcy filing or re‐
ceipt of the letters in violation of the bankruptcy automatic stay.
No. 21‐3131 15

invasion of privacy or intrusion upon seclusion, and that his
motion merely rehashed many of his earlier arguments. The
district court’s ruling on such a motion is reviewed under a
deferential standard and will be reversed only if the district
court abused its discretion. United States v. Resnick, 594 F.3d
562, 568 (7th Cir. 2010).
 The district court correctly found that Pucillo has not al‐
leged a concrete and particularized injury in fact, so there is
no Article III standing. That court committed no manifest er‐
rors of law or fact, that is “the wholesale disregard, misappli‐
cation, or failure to recognize controlling precedent.” Oto v.
Metro. Life Ins. Co., 224 F.3d 601, 606 (7th Cir. 2000) (quoting
Sedrak v. Callahan, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997)).
And Pucillo does not argue there is newly discovered evi‐
dence. See Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 954
(7th Cir. 2013) (cleaned up). Pucillo’s motion restated argu‐
ments that he had previously offered without success, rather
than offer new ones. The district court therefore did not abuse
its discretion in denying Pucillo’s motion to amend or alter
the judgment.
 * * *
 For these reasons, we AFFIRM the dismissal of this case for
lack of standing.
16 No. 21‐3131

 LEE, Circuit Judge, dissenting. The Supreme Court has laid
out an analytical roadmap for cases just like this. To deter‐
mine whether a plaintiﬀ like Pucillo has satisfied the require‐
ment of concrete harm to establish Article III standing in cases
arising from the FDCPA (and similar statutes), “courts should
assess whether the alleged injury to the plaintiﬀ has a ‘close
relationship’ to a harm ‘traditionally’ recognized as providing
a basis for a lawsuit in American courts.” TransUnion LLC v.
Ramirez, 141 S. Ct. 2190, 2204 (2021) (quoting Spokeo, Inc. v.
Robins, 578 U.S. 330, 341 (2016)). In conducting this inquiry,
courts should ask whether the plaintiﬀ has “identified a close
historical or common‐law analogue for [his] asserted injury,”
recognizing that the injury need not have “an exact duplicate
in American history and tradition.” Id. What is more, the as‐
serted injury can take the form of traditionally recognized in‐
tangible harms, including “reputational harms, disclosure of
private information, and intrusion upon seclusion.” Id. Be‐
cause Pucillo satisfies these requirements, I respectfully dis‐
sent.
 In keeping with TransUnion, Pucillo analogizes his as‐
serted injuries to those suﬀered by a person who has experi‐
enced a tortious invasion of privacy, specifically an unwanted
intrusion upon seclusion. See Persinger v. Sw. Credit Sys., L.P.,
20 F.4th 1184, 1192 (7th Cir. 2021) (observing that the tradi‐
tional tort of invasion of privacy encompasses four theories of
harm: intrusion upon seclusion, appropriation of a person’s
name or likeness, publicity given to private life, and false
light). This analogy is apt.
 As the majority opinion notes, the tort of unwanted intru‐
sion upon seclusion is triggered when one “intentionally in‐
trudes … upon the solitude or seclusion of another or his
No. 21‐3131 17

private aﬀairs or concerns,” where such an intrusion “would
be highly oﬀensive to a reasonable person.” RESTATEMENT
(SECOND) OF TORTS § 652B (AM. L. INST. 1977); see also Gadelhak
v. AT&T Servs., Inc., 950 F.3d 458, 462 (7th Cir. 2020) (Barrett,
J.) (“The common law has long recognized actions at law
against defendants who invaded the private solitude of an‐
other by committing the tort of ‘intrusion upon seclusion.’”).
And in Gadelhak, we held that the plaintiﬀ’s receipt of five un‐
wanted text messages was suﬃcient to establish concrete
harm based upon an intrusion‐upon‐seclusion theory for a
claim arising under the Telephone Consumer Protection Act,
47 U.S.C. § 227 et seq. Gadelhak, 950 F.3d at 462.
 The majority opinion agrees with this reading of Gadelhak.
However, it attempts to distinguish Gadelhak, positing that,
while unwelcomed text messages can be unwanted intrusions
“because they can disrupt a person anytime, anywhere,”
postal mail cannot, because it “is delivered to a mailbox with‐
out interrupting the recipient’s seclusion.” But in so doing,
the majority opinion discounts the particular facts of Pucillo’s
case and mandates more than what Spokeo and TransUnion re‐
quire.
 Here, Pucillo went through the considerable eﬀort and ex‐
pense of filing a bankruptcy petition and obtained a discharge
of his debts, including the one at issue here. The bankruptcy
court’s order gave him a fresh start and freed him from his
obligations to his former creditors. In re Chambers, 348 F.3d
650, 653 (7th Cir. 2003) (“The primary purpose of bankruptcy
discharge is to provide debtors with a fresh start.”); Loc. Loan
Co. v. Hunt, 292 U.S. 234, 244 (1934) (“[The Bankruptcy Act]
gives to the honest but unfortunate debtor … a new oppor‐
tunity in life and a clear field for future eﬀort, unhampered by
18 No. 21‐3131

the pressure and discouragement of pre‐existing debt.”). With
this order in hand, Pucillo had the right and a well‐founded
expectation to be free from the eﬀorts of debt collectors, like
National Credit, to collect on these discharged debts, whether
by text, facsimiles, or mail. And by sending him two letters to
collect on one of the discharged debts, National Credit dis‐
rupted Pucillo’s right to seclusion, putting this case squarely
within the bounds of Gadelhak.1
 The majority opinion, however, believes that unwanted
postal mail is materially diﬀerent from the unwanted text
messages at issue in Gadelhak. It rests on two principal distinc‐
tions: first, that letters are delivered to mailboxes, not phones,
and thus are less intrusive by their very nature; and second,
that even if two unwanted letters are an irritation, they do not
occasion the same level of intrusion that numerous unwanted
text messages generate. But this leads one to ask whether the
majority opinion would have arrived at a diﬀerent conclusion
had National Credit sent Pucillo hundreds of letters (say,
three or four every day), rather than just two? After all, the
intrusion a person would feel from receiving, opening, read‐
ing, and discarding hundreds of unwanted, ill‐founded dun‐
ning letters would certainly be greater than that he would feel

 1 To the extent the majority opinion believes that Pucillo should have

provided a more complete description of his injury in his amended com‐
plaint or declaration to track the common law intrusion‐upon‐seclusion
claim (for example, by including the phrase “intrusion upon seclusion”),
the source of this pleading obligation is unclear. TransUnion does not re‐
quire Pucillo to actually plead a common law claim in his complaint, let
alone a successful one; it merely requires him to set forth a theory of injury
that has been recognized at common law. And we have long held that le‐
gal theories need not be pleaded in a complaint. Avila v. CitiMortgage, Inc.,
801 F.3d 777, 783 (7th Cir. 2015).
No. 21‐3131 19

deleting a few unwanted text messages. And, by cautioning
against overreading the opinion to “encompass[ ] intrusive
uses of either the mail or other kinds of contact not now before
us,” the majority opinion appears to recognize that unwanted
postal mail can be intrusive in certain circumstances, just not
here.
 If it is the diﬀerence in degree of the intrusion between text
messages and postal mail that animates the majority opinion,
this would directly contravene the Supreme Court’s instruc‐
tions in Spokeo to focus on the “kind” of harm, not its “de‐
gree.” See Gadelhak, 950 F.3d at 462 (“But when Spokeo in‐
structs us to analogize to harms recognized by the common
law, we are meant to look for a ‘close relationship’ in kind, not
degree.”). Indeed, the “kind” of harm experienced by Pucillo
and the plaintiﬀ in Gadelhak is the same—disruption, annoy‐
ance, aggravation, and the like caused by the unwelcome in‐
trusion upon seclusion. Only the means and degree are diﬀer‐
ent.
 Thus, by focusing on the number of letters and the degree
of the intrusion, the majority opinion imposes requirements
that Spokeo and TransUnion do not. After all, remember that
Pucillo’s allegations need not state a successful intrusion‐
upon‐seclusion claim, but only set forth a comparable type of
injury that the claim could remedy at common law. See Per‐
singer, 20 F.4th at 1192 (“Whether [plaintiﬀ] would prevail in
a lawsuit for common law invasion of privacy is irrelevant. It
is enough to say that the harm alleged in her complaint re‐
sembles the harm associated with intrusion upon seclusion.”);
Gadelhak, 950 F.3d at 463 (“A few unwanted automated text
messages may be too minor an annoyance to be actionable at
common law. But such texts nevertheless pose the same kind
20 No. 21‐3131

of harm that common law courts recognize—a concrete harm
that Congress has chosen to make legally cognizable.”).
Pucillo’s allegations do just that.
 On the other hand, if the majority opinion views the harm
caused by unwanted postal letters as diﬀerent in kind than the
harm created by unwanted text messages, it is diﬃcult to see
why that would be the case. These days, it is a rather simple
matter to silence, block, delete, or flat out ignore unwanted
text messages. It is arguably more arduous to go to one’s mail‐
box, open, read, and then discard postal mail. And while it is
true that mail is delivered to a mailbox and not one’s phone,
one must retrieve and read the mail at some point because the
United States mail is still a recognized way of providing legal
notice and conducting business, ignored at one’s own peril.
 All this is to say that, taking the Supreme Court’s direction
that we consider whether the harms asserted by Pucillo bear
a “close relationship” in kind to those recognized at common
law, see Spokeo, 578 U.S. at 341, combined with its admonition
that we not insist upon “an exact duplicate” between the two,
TransUnion, 141 S. Ct. at 2204, I would hold that the injury a
person suﬀers when his seclusion is intruded upon by un‐
wanted dunning letters seeking to collect a debt he knows to
be discharged is comparable to the injury he suﬀers when he
receives unwanted text messages on his phone. We already
have held that the latter is suﬃcient to establish concrete in‐
jury for Article III purposes, see Gadelhak, 950 F.3d at 462; the
former is as well.2

 2 We also found Article III standing in Persinger where the defendant

collection agency inquired into the plaintiff’s credit report without author‐
ization and in violation of the Fair Credit Reporting Act. See 20 F.4th at
No. 21‐3131 21

 Historical common law analogies, however, form just one
part of the TransUnion analysis. To determine whether Na‐
tional Credit’s letters to Pucillo caused concrete harm, we also
must consider “Congress’s judgment.” Gadelhak, 950 F.3d at
462; see also Spokeo, 578 U.S. at 341 (noting that, “because Con‐
gress is well positioned to identify intangible harms that meet
minimum Article III requirements, its judgment is also in‐
structive and important”). This is because, while Congress
cannot “enact an injury into existence,” it may “elevate harms
that exist in the real world before Congress recognized them
to actionable legal status.” TransUnion, 141 S. Ct. at 2205
(cleaned up).
 This inquiry into Congress’s intent buttresses the conclu‐
sion that Pucillo has adequately alleged concrete injury here.
Indeed, protecting the privacy rights of individuals contacted
by debt collectors is one of the reasons that Congress enacted

1192. The majority opinion distinguishes Persinger by noting that Pucillo
has not alleged that National Credit has ever reported to, solicited from,
or otherwise contacted any credit reporting agencies regarding Pucillo’s
allegedly owed debt. But, while the plaintiff’s theory of injury in Persinger
relied upon a personal right to secrecy, a run‐of‐the‐mill common law in‐
trusion‐upon‐seclusion claim does not require a “publication” element.
See Am. States Ins. Co. v. Cap. Assocs. of Jackson Cnty., Inc., 392 F.3d 939, 942
(7th Cir. 2004) (disapproving decisions that fail to distinguish secrecy from
seclusion and stating that “[i]n a secrecy situation, publication matters;
otherwise secrecy is maintained. In a seclusion situation, publication is ir‐
relevant. A late‐night knock on the door or other interruption can impinge
on seclusion without any need for publication.”); RESTATEMENT (SECOND)
OF TORTS § 652B cmt. a (intrusion upon seclusion “consists solely of an in‐
tentional interference with [a person’s] interest in solitude or seclusion,
either as to his person or as to his private affairs or concerns” (emphasis
added)).
22 No. 21‐3131

the FDCPA in the first place. See 15 U.S.C. § 1692(a) (“There is
abundant evidence of the use of abusive, deceptive, and un‐
fair debt collection practices by many debt collectors. Abusive
debt collection practices contribute to the number of personal
bankruptcies, to marital instability, to the loss of jobs, and to
invasions of individual privacy.” (emphasis added)). The major‐
ity opinion nevertheless concludes that absent “tangible con‐
sequences,” two letters from a debt collector is not the “kind
of abusive practice Congress sought to prevent.” But the
abuse that forms the basis of Pucillo’s claim lies not in the two
letters per se, but in National Credit’s eﬀorts to collect on a
debt that Pucillo knows is void.3 And in passing the FDCPA,
Congress intended to protect “unsophisticated consumers”
from such practices. See S. REP. NO. 95‐382, at 1 (1977) (the
FDCPA’s “purpose is to protect consumers from a host of un‐
fair, harassing, and deceptive debt collection practices”); id. at
4, 7 (expressly prohibiting, among other things, “misrepre‐
senting the consumer’s legal rights,” “collecting more than is
legally owing,” and “misrepresenting the amount or nature
of a debt”). Congress’s judgment therefore supports standing
here.
 A couple of additional points. The majority opinion mis‐
characterizes Pucillo’s allegations as complaining only about
the risk of future harm, e.g., the risk that his credit would be
negatively impacted or the risk that his bankruptcy discharge
was futile. The majority opinion is correct that, after TransUn‐
ion, the mere risk of future harm is insuﬃcient to provide
standing in a claim for damages. But that is not the issue here.

 3 Whether National Credit’s letters were bona fide errors (as it con‐

tends) or intentionally abusive collection efforts (as Pucillo claims) is a
merits question unrelated to the issue of standing.
No. 21‐3131 23

Pucillo has actually suﬀered concrete emotional injuries—con‐
fusion, aggravation, alarm—as a result of National Credit’s
actions. TransUnion recognizes that where a risk of future
harm causes a plaintiﬀ to suﬀer some other independent in‐
jury, the plaintiﬀ has standing in a claim for damages. 141 S.
Ct. at 2211 (holding that because “plaintiﬀs present [no] evi‐
dence that the class members were independently harmed by
their exposure to the risk itself—that is, that they suﬀered
some other injury (such as an emotional injury) from the mere
risk that their credit reports would be provided to third‐party
businesses,” they had no standing). And, here, Pucillo’s pur‐
ported injury is not the risk of future harm but the current
emotional harm caused by that risk. This is enough to confer
standing.
 Furthermore, relying on a series of our recent decisions,
the majority opinion also suggests that emotional harms
Pucillo suﬀered are per se insuﬃciently concrete to satisfy
standing; that his allegations of confusion and aggravation
cannot alone provide a basis for injury‐in‐fact. Although this
principle has gained a foothold in our recent cases, see, e.g.,
Brunett v. Convergent Outsourcing, Inc., 982 F.3d 1067, 1068 (7th
Cir. 2020), it too overstates what TransUnion requires. In
TransUnion, the Supreme Court declined to find standing for
various class members where there was no evidence they had
even “opened the dual mailings, nor that they were confused,
distressed, or relied on the information in any way.” 141 S. Ct.
at 2213, 2214 (cleaned up). This can hardly be read to require
the “emotional harm‐plus” test that our case law has come to
adopt. See Brunett, 982 F.3d at 1069 (holding that, absent the
plaintiﬀ’s detrimental reliance on her confusion, there is no
standing); see also Pierre v. Midland Credit Mgmt., Inc., 29 F.4th
24 No. 21‐3131

934, 939 (7th Cir. 2022), cert. denied, 143 S. Ct. 775 (2023) (col‐
lecting cases).
 Indeed, nothing in TransUnion can be read to require a
plaintiﬀ’s detrimental reliance on his emotional harm to have
standing. And insisting on such reliance ignores TransUnion’s
express recognition that intangible harms are suﬃciently con‐
crete to confer standing when they resemble those tradition‐
ally recognized at common law.4 141 S. Ct. at 2213. Pucillo’s
alleged intangible harms fall well within this category. See
Gadelhak, 950 F.3d at 462 (“Courts have also recognized liabil‐
ity for intrusion upon seclusion for irritating intrusions[.]”);
see also, e.g., Imagine Medispa, LLC v. Transformations, Inc.,
999 F. Supp. 2d 873, 886 (S.D.W. Va. 2014) (finding that allega‐
tions that scores of calls due to the defendants’ conduct
caused “annoyance and inconvenience” and were “disrup‐
tive” to the plaintiﬀ’s personal life were suﬃcient to state a
claim for intrusion upon seclusion under West Virginia law);
Lovings v. Thomas, 805 N.E.2d 442, 446 (Ind. Ct. App. 2004) (ac‐
knowledging that intrusion‐upon‐seclusion claims “involve
injuries to emotions and mental suﬀering”); Billings v. Atkin‐
son, 489 S.W.2d 858, 861 (Tex. 1973) (“Damages for mental suf‐
fering are recoverable without the necessity of showing actual
physical injury in a case of willful invasion of the right of pri‐
vacy[.]”); Carey v. Statewide Fin. Co., 223 A.2d 405, 405–06

 4 The majority opinion’s call for a limiting principle is understandable.

But such guardrails already exist. Article III standing requires not only
that the injury is concrete, but that it is particularized, i.e., that it “affect[s]
the plaintiff in a personal and individual way,” and is not common to all
members of the public. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 n.1 (1992).
This prerequisite that a plaintiff must have a “personal stake in the out‐
come,” Baker v. Carr, 369 U.S. 186, 204 (1962), would preclude the slippery‐
slope scenario posed by this court in Brunett. See 982 F.3d at 1068.
No. 21‐3131 25

(Conn. Cir. Ct. 1966) (finding the plaintiﬀ’s allegations that
defendant’s calls “continued to harass and annoy” her and
caused her to suﬀer “great mental pain” adequately stated an
invasion‐of‐privacy claim); Housh v. Peth, 133 N.E.2d 340, 344
(Ohio 1956) (aﬃrming judgment where defendant “har‐
ass[ed] and humiliate[d] the plaintiﬀ and cause[d] her mental
pain and anguish” when attempting to collect a debt). Such
injury is therefore enough here, too.
 In the end, the majority opinion tries to faithfully follow
the principles the Supreme Court announced in Spokeo and
TransUnion. But for the reasons described, I believe that it
overreads these principles as applied to the particular facts of
this case. I respectfully dissent.